IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHER SANDBERG,

                                                   OPINION AND ORDER

              Plaintiff,

                                                   12-cv-756-bbc

      v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Cher Sandberg is seeking review of a decision denying her claim for disability benefits and supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). Plaintiff believes that the administrative law judge erred in a number of respects in finding that she was not disabled because she could still perform sedentary work in jobs that existed in significant numbers in the national economy.

      Plaintiff overstates the administrative law judge's errors to some extent but her overall assessment of his work is correct. The decision is sufficiently flawed that it cannot stand but must be reversed and remanded to the commissioner.

      The following facts are drawn from the administrative record (AR).


RECORD FACTS

      Plaintiff Cher Sandberg was born on June 13, 1975. On April 9, 2008 she injured

1

her back moving a patient at the care facility where she was working. A week after the injury occurred, plaintiff saw a chiropractor who, over a period of time, performed adjustments on her back, took x-rays and gave her exercises to do at home. AR 252-88. On April 28, 2008, the doctor certified that she had recovered sufficiently to return to work on light duty only, with no lifting of more than 10 pounds and limited bending and twisting and on a reduced schedule. AR 263.

From May through July 2008, plaintiff had ten treatments at the Institute for Athletic Medicine before she moved from Minnesota to Wisconsin. AR 295-309. In her "spine discharge report" from the institute, her therapist wrote that she continued to have debilitating pain and had been able to tolerate only isometric exercises and gentle manual therapy. Other efforts caused significant pain. AR 307. Plaintiff was to continue physical therapy in Rhinelander, Wisconsin, after she moved to Wisconsin. Id.

Plaintiff saw a chiropractor in Rhinelander, starting in mid-summer of 2008. AR 311-27. He reported in his October 3, 2008 treatment notes a conversation with a radiologist in Minneapolis who had reviewed plaintiff's most recent lumbar x-rays. The radiologist had confirmed the chiropractor's belief that plaintiff had Bertolotti's snydrome: her L5 vertebrae was an "asymmetrical transitional vertebrae." Id. Her "tightness and lack of movement on the right due to the stiff and large sacral joint combined with the more free movement of the left lumbar type of a joint causes an asymmetrical torqueing kind of a motion and along with almost complete loss of the L5-S1 disc puts significant and asymmetrical stress upon the L4-L5 joint, which overloads that joint and leads to premature

disc injury." Id.

In addition to the chiropractic care, plaintiff had 24 visits to physical therapy from July 21, 2008 to September 2, 2008. AR 358-68. In the record for the last session, the therapist reported that plaintiff had not appeared motivated for the preceding several sessions, AR 360, although on August 15, the therapist had reported steady progress, AR 362, and on August 22, he reported that she seemed to be doing well. AR 361.

In September 2008, Dr. Marc Durette reviewed plaintiff's physical therapy records and discontinued further therapy after concluding that plaintiff had reached a plateau in her recovery. He found that she was still unable to return to work and he recommended that she continue having chiropractic assessment and treatment. AR 330-31. He noted that a followup MRI might be needed to determine whether her anular tear had worsened or there had been changes in the disc bulges seen on her prior MRI. AR 330.

On January 30, 2009, Dr. Durette reported that plaintiff had had "the nerve-burning procedure" (presumably referring to radiofrequency ablation, as performed by Dr. Sikka, AR 401) several weeks earlier and that it had reduced her pain significantly. AR 385. Plaintiff assessed her pain at 3 out of 10 along her left lower back and buttock region. A recent EMG had been negative for significant nerve involvement. Id. Durette ordered an MRI and x-rays. He found that plaintiff's "active range of motions" in her trunk was within functional limits but that she reported increased pain during trunk extension as compared to flexion. (Plaintiff could touch her fingers to the floor.) AR 386.

In November 2008, Dr. Brian Bunch, a neurosurgeon, saw plaintiff for a consultation

on referral from Dr. Durette. AR 369-72. Bunch found that plaintiff had some tenderness at her left lumbosacral area, intact light touch sensation in her legs and normal ambulation. X-rays of her lumbar spine demonstrated a "transitional lumbarsacral segment," but an MRI of her lumbar spine showed no evidence of any significant loss of height of the L5-S1 disc, of any significant posterior disc bulging or of any compression on her exiting nerve roots or cauda equina. AR 370. Bunch was unable to identify the exact "pain generator" for plaintiff's back pain, although he suspected the left LF-S1 facet or the left sacroiliac joint, and he recommended that plaintiff have some injections in that area to see whether they relieved her pain. Id. He recommended a referral to a pain clinic. Id.

On December 16, 2008, Dr. Gurkirpal Sikka administered facet joint blocks to plaintiff at the L4-5 and L5-S1 and in the left SI joint levels that immediately decreased her pain. AR 396. A week later on December 23, 2008, he administered another joint block at the SI joint, after plaintiff returned, saying that the pain had come back, although she felt "about 50% better. AR 397. A week later, Sikka performed a medial branch block on plaintiff's left side at the L1, L2, L3, L4, L5 and S1 levels. AR 399-400. He estimated that plaintiff was 75-80% better and recommended that the next step be radiofrequency ablation from L1 to S1. AR 400. He undertook this procedure on January 12, 2009, AR 401-02. On January 23, 2009, he injected plaintiff's left piriformis muscle. AR 403. Plaintiff had immediate relief, with pain down to 1 out of 10. Id. The following month, Sikka repeated the procedure and prescribed Lexapro to help calm plaintiff and allow her to sleep more soundly. AR 405. After plaintiff told him that the physical therapy was increasing her pain,

he recommended that she stop. Id. Dr. Sikka left it to Dr. Durette to assess plaintiff's ability to return to work. AR 403.

In January 2010, plaintiff saw Dr. Bhupinder Saini of Advanced Pain Management in Greenfield, Wisconsin. AR 656. Saini concluded that plaintiff's conservative therapy had failed to help her and he recommended diagnostic provocation discography to determine the primary generator of her pain, AR 658, which he performed on January 25, 2010. AR 652. On February 22, 2010, plaintiff reported that her pain had not changed. AR 653.

In June 2010, Dr. Jack Drogt performed a second independent medical re-evaluation of plaintiff in Minnesota for worker's compensation purposes. AR 661. (He had performed an earlier one on March 21, 2009.) He reported that plaintiff had a preexisting low back condition and degenerative disc disease at L4-5 and L5-S1 that was aggravated by a work-related injury in April 2008. AR 662. He found that she was unable to return to work in any capacity. Id. He also found that although she had improved as of March 2009, she had deteriorated since then. AR 665.

Later investigation showed that L4-5 lumbar disc degeneration was plaintiff's primary pain generator. In November 2010, Dr. Andrew Beaumont performed a surgical lumbar decompression and instrumental fusion. AR 919. On December 27, 2010, plaintiff told Beaumont that she was doing very well and had noticed significant improvement in her preoperative symptoms. Id. She had reduced her pain medication significantly, was feeling steady enough to walk without a walker and was compliant with her TLSO (thorocolumbosacral brace, Dorland's Illus. Medical Dictionary at 1932 (32d ed.)). Id. She

reported her pain as 4 or 6 out of 10. AR 920. At the time, Dr. Beaumont reported that plaintiff would remain off work and would return to see him in six weeks. He advised her to continue to increase her level of activity and ambulation. Id. In answering a Social Security Spinal Disorder RFC Questionnaire three months later, on March 11, 2011, he said that plaintiff's impairments had lasted or could last at least 12 months. AR 922. He anticipated that plaintiff's pain or medication side effects would interfere with her attention between 25 and 50 % of the day, that she was capable of working at a low stress job, that she was presently unable to ambulate effectively without assistance so that she could travel to and from work, shop, etc., but that the goal was to achieve this in the future, AR 923, and that she was using a wheeled walker for help with standing and walking but wanted to walk without assistance, AR 934. In Beaumont's opinion, plaintiff was not yet able to work either full time or half time without conditioning, id., and when she did work, she would need three to four 15-minute breaks each day, could lift and carry ten pounds or less occasionally, sit for 30 minutes continuously and stand for 15 minutes continuously. AR 925-27. Beaumont noted that no formal therapy had been initiated at the time and that his answers were based upon his assessments of plaintiff from her appointments at the clinic and her own descriptions of her symptoms. AR 927.

On October 29, 2009, Dr. Pat Chan, an agency physician, completed a residual functional capacity assessment of plaintiff. AR 478-85. He estimated that she could lift ten pounds occasionally and less than ten pounds frequently, that she could stand or walk with normal breaks for at least two hours in a normal eight-hour workday, that she could sit with

normal breaks for about six hours in a normal workday and that her ability to push and pull were unlimited other than for the limitations shown for lifting and carrying. AR 479. He assessed no postural, manipulative, visual, communicative or environmental limitations. AR 480-82. He noted that plaintiff's lumbar spine showed marked disc space narrowing at L5-S1 and moderate L4-5 disc degeneration, but no stenosis or impingement, that plaintiff had had some lessening of her pain from radiofrequency ablation that had led to improvements in her activities of daily living and that her Gaenslen's and FABERE tests were positive for pain on the left side. (In the Gaenslen's test, one leg is pressed down to produce hyperextension of the hip; the FABERE test assesses *f*lexion, *a*bduction, *e*xternal *r*otation and *e*xtension. Dorland's, 1713 & 1896). Plaintiff's straight leg raising was negative, her reflexes were intact and her radicular pain was limited. She reported pain from walking or sitting too long, but was able to prepare quick meals, do light chores and shop with assistance from her boyfriend. She could walk for only 10-15 minutes without stopping to rest for 10 minutes. AR 485. She was going to school part-time and using ice packs in class and at home. Id.

On January 19, 2010, Dr. Philip Cohen, an agency physician, completed a second residual functional capacity assessment of plaintiff. AR 625-632. Cohen found that plaintiff's back condition did not seem to have worsened and that she continued to have pain in her low back, left hip and left leg. AR 630. His assessments of plaintiff's limitations and physical capacity were the same as Chan's.

Agency psychologist Jack Spear completed a psychiatric review technique for plaintiff on October 29, 2009, AR 486-98, in which he found that plaintiff had no mental disorders

and no functional limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace or episodes of decompensation. AR 496. He noted that the file contained no evidence of any diagnosis of a mental impairment, although she had seen a social worker about possible depression. He concluded that plaintiff's mental status showed that she was somewhat stressed but that her attention, concentration and memory were intact and that she was not significantly limited mentally. AR 498.

Agency psychologist Dr. Eric Edelman prepared a psychiatric review technique for plaintiff on January 20, 2010. AR 633-46. He found that she had no severe medically determinable impairment, that she had depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness and difficulty concentrating or sleeping. AR 636. He found also that plaintiff had generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity and apprehensive expectation. AR 638. He concluded that plaintiff had no restriction of activities of daily living, only mild restrictions in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation. AR 643. He noted that plaintiff had back problems that caused her discomfort and diminished her activities, causing her some depression and anxiety. AR 645.

Plaintiff had a video hearing before Administrative Law Judge Thomas Cheffins on March 11, 2011. She was represented by counsel. She testified that she lived with her boyfriend in a rented house, that she had been attending college for four years but had not received a degree, although she had certificates for certified nursing assistant and for

transmedication assistant dating from 1995 and 1997. AR 34. She did not have any income but received food stamps and health insurance through the state Badger Care program. AR 35. She had not worked since 2008 when she had been working as both a certified nursing assistant and transmedication assistant. Since then she had applied for jobs in nursing homes and group homes, but was deemed not qualified for the jobs because of her inability to ambulate and to lift more than 10 pounds. AR 36.

Plaintiff tried applying for unemployment benefits in Minnesota when she was living there, but her application was denied when she said she would not quit her schooling to obtain work. AR 36-37. After she moved to Wisconsin, the Wisconsin Department of Vocational Rehabilitation recommended the nursing program to her. AR 38. She testified that she was waiting to see whether she healed before continuing in her nursing program because she could not advance into the "nursing core" of the program unless she could pass a physical and lift more than 50 pounds. If she was unable to pass the physical, she was thinking of switching to social work or something similar. AR 37.

Plaintiff testified that since 2008, her pain had kept her from working full time. AR 38. She was unable to sit, walk or stand more than 10 minutes at a time without feeling pain in her lower back and left buttock, despite her many attempts at treatment, and she spent most of her day in bed. AR 39. Before she stopped going to school, she had been forced to carry ice packs with her to apply to her back in order to get through her classes, although she limited herself to one to two classes at a time. Id. The school permitted her to sit in the back of the classroom and stand, walk around or lie down as needed to relieve

her pain. Id. She testified that when she was not attending classes, she spent most of her day in bed lying on ice packs, experiencing a level of pain that was about 8 to 9 out of 10 on a daily basis. AR 40. She did almost no chores, except folding laundry or occasionally making small meals, and mostly read books and magazines and watched television. AR 40-41. She had trouble completing her homework while she was in school because it was hard for her to concentrate. AR 41. However, after she had surgery in November 2010, her pain level had diminished considerably. AR 42-43. She was able to walk for much longer periods of time (20 to 25 minutes at a time on the treadmill several times a day) and sit "a little more comfortably" for about 20 minutes before she needed to stand and walk a little before sitting down again. AR 43. She estimated her pain level was down to about 2 out of 10. Id.

In response to questions from the administrative law judge, plaintiff said that she had attempted to fish after her injury but had found it too uncomfortable to sit in a boat, even with a cushioned seat, so she had stopped about a year and a half before her hearing because of the pain it caused her. AR 46-47. She had also tried swimming for pain relief, which helped, but she had to give it up because she did not have the money to pay the pool fee.

A vocational expert, Nathan Dean, testified that a person of plaintiff's age, education and work experience who could perform at the sedentary exertional level with no additional limitations could not perform plaintiff's past relevant work but could perform a job as food and beverage order clerk in a hotel or resort, which was sedentary and unskilled work. AR 50-51. The same person could perform the job of charge account clerk or telephone

10

quotation clerk, both of which were also sedentary and unskilled jobs, AR 51, and could perform all three of those jobs even if she were unable to climb, balance, stoop, crouch, kneel and crawl more than occasionally. AR 52. If the person had to have a sit and stand option, she could perform only the jobs of food and beverage order clerk and telephone quotation clerk. AR 52-53. If the person could perform only work limited to simple routine and repetitive tasks with only occasional decision making, she could not perform any of the jobs. AR 53.

The administrative law judge found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013, that she had not engaged in any substantial gainful activity since April 9, 2008 and that she had the severe impairments of back injury, Bertolotti Syndrome, high blood pressure and depression. AR 14. He found that plaintiff did not have an impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. Subpart P, App. 1. He explained why he found that plaintiff's mental impairment of depression did not meet or equal the criteria of listings 12.04 and 12.06, noting that plaintiff had never been found to have marked difficulties in maintaining concentration, persistence or pace, in maintaining social functioning or episodes of decompensation. She had mild restrictions in activities of social daily living and social functioning and moderate difficulties with concentration, persistence or pace, with her concentration problems stemming from her pain and not her depression. AR 15. The administrative law judge did not discuss his reasons for finding that plaintiff's physical impairments did not meet or equal a listing.

The administrative law judge found that plaintiff had the residual functional capacity to perform sedentary work with restrictions: no climbing ladders, ropes or scaffolds, occasionally climbing ramps or stairs, occasionally balancing, stooping, kneeling, crawling or crouching, with the option to sit or stand at will, "provided she is not off task for more than 10% of the work period." AR 16. He found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her testimony about the persistence, intensity and limiting effects of the symptoms were not credible "to the extent they are inconsistent with the residual functional capacity assessment." Id. She had received only conservative treatment for her impairments, the positive clinical and diagnostic findings did not support more restrictive functional limitations than the ones he had found and that her ability to preform the limited activities of daily living were sufficient to obtain and maintain employment and inconsistent with the presence of an incapacitating condition. AR 17. In the administrative law judge's opinion, her participation in those activities undermined the credibility of her reports about her allegedly disability. Id.

The administrative law judge summarized plaintiff's medical treatment from the time she was injured, id., noting that at various times Dr. Durette and other treating physicians he did not name, along with Dr. Drogt, who saw her for worker's compensation purposes, had expressed the opinion that she was unable to return to work or was totally disabled and that one had done so as recently as March 11, 2011 but he found these opinions unpersuasive. He noted that he was giving the March 2011 report (by Dr. Beaumont) little

weight because it was "not consistent with the medical evidence of record" and with plaintiff's reports of "a somewhat normal level of daily activity and interaction." AR 19.

In the administrative law judge's view, the state agency physicians' evaluations were more persuasive than those of plaintiff's treating physicians and merited "great weight." AR 18. He found plaintiff's subjective comments "less than fully credible" and unsupported by the objective medical evidence, in light of her continuing to attend nursing school, swim and fish. AR 19. He acknowledged that plaintiff had had some limitation in her activities, such as gardening, volleyball, traveling and camping, but that she had been able to function at a fairly normal level and was continuing to improve. Id.

The administrative law judge concluded that plaintiff was unable to perform her past relevant work but had the residual functional capacity to perform sedentary work in jobs that existed in the national economy. Therefore, he concluded that she was not disabled.

OPINION

Plaintiff contends that the administrative law judge erred in five respects: (1) he failed to give proper weight to the opinion of plaintiff's treating physicians; (2) he failed to give proper weight to the opinion of an examining source; (3) his credibility assessment of plaintiff is flawed because he relied on boilerplate language and a misstatement of the record; (4) he found that plaintiff suffered from depression and found it a severe impairment, but he failed to explain why it did not affect her ability to work; and (5) he failed to consider whether plaintiff's musculoskeletal impairments met or equaled Listing 1.04 of the Social

Security regulations, 20 C.F.R. Part 404, Subpart P, App. 1.

## A. Treating Physicians

As plaintiff points out, the administrative law judge failed to give proper weight to the opinions of Drs. Durette and Beaumont, who treated her back pain and filed written opinions about her ability to return to work. In rejecting Dr. Beaumont's report, the administrative law judge wrote only, "Little weight is given the treating physician's opinion of March 11, 2011. It is not consistent with the medical evidence of record," AR 19, without explaining why it was not consistent or what "medical evidence of record" he was considering that outweighed Dr. Beaumont's findings. Instead, he said that he found the state agency physician's opinions persuasive and accorded them "great weight." By itself, a contradictory opinion of a non-examining physician is not enough to support the rejection of an examining physician's opinions. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

The general rule is that the administrative law judge is to give controlling weight to the professional opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances so long as the opinion is supported by medical findings and not inconsistent with other substantial evidence in the record. Clifford v. Astrue, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(d)(2). If the administrative law judge rejects the opinion, he must "minimally articulate his reasons for crediting or rejecting evidence of disability." Id. at 871 (citing Knight v. Chater, 55 F.3d

14

308, 313 (7th Cir. 1995) (administrative law judge must give substantial weight to medical evidence "unless specific, legitimate reasons constituting good cause are shown for rejecting it"). In this case, the administrative law judge failed to articulate his reasons for rejecting Dr. Beaumont's findings and opinions. He did no better with Dr. Durette's opinions: he gave them "little weight" because he found them inconsistent with the objective medical evidence or plaintiff's reported activities, without explaining what the objective medical evidence was or what plaintiff's reported activities were.

Throughout his report, the administrative law judge's summary of the medical evidence was slanted in favor of the commissioner. For instance, he noted that as of March 27, 2009, plaintiff had "done reasonably well and she had gotten 70% better," without referring to Dr. Bhupinder Saini's January 2010 report that plaintiff's conservative therapy had failed to help her, AR 658, or Dr. Drogt's worker's compensation conclusion that despite plaintiff's improvement as of March 2009, she had deteriorated since then. AR 665. He relied on evidence showing that plaintiff had received numerous injections between December 2008 and January 2010 that had provided relief from pain without mentioning that the relief from the injections had been only temporary, as Dr. Saini had noted. In reviewing plaintiff's "activities of daily living," he found that she could swim, do housework and fish, without acknowledging that the swimming was done for therapeutic purposes, the housework was limited to folding clean clothes and making minimal meals and the fishing had been discontinued more than a year earlier, when plaintiff found it too uncomfortable to sit in a boat. He relied on plaintiff's ability to attend classes even though she had testified

15

she could do this only because she brought along ice packs and could sit, stand, walk around and even lie down at will and that she went to bed as soon as she came home. He did not discuss plaintiff's Bertolotti's syndrome or how it might affect her ability to heal.

The administrative law judge's failure to give an adequate explanation of his rejection of plaintiff's treating physicians is a sufficient reason to reverse the commissioner's decision and remand this case. I will discuss the remaining errors alleged by plaintiff briefly, so that the administrative law judge hearing the case on remand may consider them.

### B. Examining Sources

The administrative law judge erred in not giving some weight to the various doctors who examined plaintiff at the request of her treating physicians. It would not have been improper for him to have ignored the findings and opinions of those doctors had he shown good reason for doing so, but he did not. As with the treating physicians, he said primarily that the alleged severity of plaintiff's symptoms was not consistent with the medical evidence or by her reported activities. This was insufficient as an explanation for disregarding the opinions of doctors who had examined plaintiff in favor of state agency physicians who had not. 20 C.F.R. § 404.1527(5).

### C. Credibility Assessment of Plaintiff

In assessing plaintiff's credibility, the administrative law judge said that her subjective complaints were less than fully credible because she had been able to take one to

two courses a semester and achieve passing grades and the evidence showed that she had been able to function at a relatively normal level with her impairments. The "evidence" he referred to was plaintiff's swimming, sitting in a boat to fish and attending school, which was inadequate, as explained above. It is noteworthy that although the state agency physicians found that plaintiff was capable of sedentary work, they also found that she was credible. The administrative law judge's credibility assessment is not persuasive.

### D. Failure to Consider Plaintiff's Depression

In evaluating plaintiff's mental state, the administrative law judge relied entirely on the opinions of the state agency psychologists who evaluated plaintiff in October 2009 and January 2010. This was proper, given the absence of any medical records from any doctor who had actually treated plaintiff for depression or even evaluated her. It is odd that he included depression as a severe impairment at the beginning of his decision, unless he was simply listing her alleged impairments, but this anomaly does not undermine his finding that plaintiff was not suffering from depression.

### E. Medical Listings

If an administrative law judge determines that the claimant has a "severe" impairment within the meaning of 20 C.F.R. § 404.1520, he must determine next whether the impairment "meets or equals a listed impairment" in 20 C.F.R. Part 4, Subpart P, App. 1. In this case, the administrative law judge considered three of the impairments he considered

17

"severe," and found that none of the three met a listed impairment. As to the two musculoskeletal impairments (back pain and Bertolotti Syndrome), he said only the barest minimum: plaintiff's severe impairments of back injury did not meet Listed Impairment 1.04 (disorders of the spine), because no treating or examining physician had recorded findings equivalent in severity to the criteria and the record contained no medical findings equivalent to those of any listed impairment. However, there would be no point in remanding this case for him to supplement his findings on this point, because plaintiff has not provided any reason to think that either of her impairments are equal to a listed impairment. Under Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999), it is the plaintiff's burden to show that she can make this showing, but she has not cited any medical record to the effect that she has herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis or degenerative disc resulting in compromise of a nerve root or the spinal cord. In fact, the medical records specifically rule out several of these conditions.

As to whether her depression meets a listed impairment, the administrative law judge devoted seven paragraphs of his opinion to explaining why plaintiff's depression did not meet a listed impairment, making it clear why he reached the decision he did. This satisfied his obligation to explain his reasoning for his conclusion.

In summary, the administrative law judge erred in failing to give proper weight to the opinions of plaintiff's treating physicians and examining sources and his credibility assessment of plaintiff is flawed. Therefore, the decision of the commissioner finding plaintiff not disabled must be reversed and the matter remanded to the commissioner for further

proceedings.

## ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying plaintiff Cher Sandberg's application for disability insurance benefits and supplemental security income is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g). The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 29th day of July, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge